George G. Braunstein, Esq. (SBN 134602)
    George@braunsteinpc.com
Clark Anthony Braunstein, Esq. (SBN 278023)
    Clark@braunsteinpc.com
Annie Berlin, Esq. (SBN 290508)
    Annie@braunsteinpc.com
**BRAUNSTEIN & BRAUNSTEIN, P.C**.
11755 Wilshire Boulevard, Suite 2140
Los Angeles, California 90025
(310) 914-4999 (Telephone)
(310) 914-4996 (Facsimile)

Attorneys for Defendants and Counterclaimants

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| ASMODUS, INC., a California corporation; HSUEH CHENG YIN, an individual | **Case No:** <u>**5:16-cv-02511-JGB-DTB**</u> (Assigned to the Hon. Jesus G. Bernal) |
| Plaintiffs, | |
| vs. | <u>**(PRELIMINARY INJUNCTION APPEAL)**</u> |
| JUNBIAO OU, et al. | |
| Defendants | **NOTICE OF APPEAL** |
| JUNBIAO OU, an individual; SHENZHEN SIGELEI TECHNOLOGY CO. LTD, a Chinese Company | |
| Counterclaimants, | |
| vs. | |
| ASMODUS, INC., et al. | |
| Counter-defendants. | |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

  **PLEASE TAKE NOTICE** that Defendants Junbiao Ou ("Ou"), Shenzhen Sigelei Technology Co., Ltd. ("Sigelei"); Dongguan Shenxi Hardware Electronics Technology Co, Ltd ("Shenxi"), ACM Supplies LLC ("ACM"), and Global Vaping, LLC ("Global") (collectively "Defendants") hereby appeals in the above-named case to the United States Court of Appeals for the Ninth Circuit from the Order Granting Plaintiffs Asmodus, Inc. and Hsueh Cheng Yin's Motion for Preliminary Injunction, entered on May 12, 2017 (Docket No. 115.)   A copy of the May 12, 2017, Order is attached hereto.

Dated: May 24, 2017                     Respectfully Submitted,

                                        BRAUNSTEIN & BRAUNSTEIN, P.C.


                                        By: ___/s/Clark Anthony Braunstein_____
                                              George G. Braunstein
                                              Clark Anthony Braunstein
                                              Annie Berlin
                                              Attorneys for Defendants
                                              Junbiao Ou, Shenzhen Sigelei Technology Co.,
                                              Ltd.; Dongguan Shenxi Hardware Electronics
                                              Technology Co, Ltd, ACM Supplies LLC, and
                                              Global Vaping, LLC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV  16-2511 JGB (DTBx)** | Date | May 12, 2017 |
|---|---|---|---|

| Title | ***Asmodus, Inc. & Hsueh Cheng Yin v. Junbiao Ou et al.*** |
|---|---|

Present: The Honorable     JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:     Order: GRANTING Plaintiffs' Motion for a Preliminary Injunction (Dkt. No. 73)(IN CHAMBERS)**

Before the Court is Plaintiffs' Motion for Preliminary Injunction, which seeks an order enjoining Defendants from, among other things, using Plaintiffs' proprietary trademarks and original expression in commerce.  ("Motion," Dkt. No. 73.)  After consideration of the papers filed in support of, and in opposition to, the Motion, as well as the Parties' arguments and testimony at the April 24, 2017 hearing, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.  The Court sets out its reasons below.

## I. BACKGROUND

### A. Procedural History

On June 15, 2016, Asmodus, Inc. ("Asmodus") and Hsueh Cheng Yin ("Yin") (collectively, "Plaintiffs"), filed a complaint against Junbiao Ou ("Ou"), Shenzen Sigelei Technology Co., ("Sigelei"), Dongguan Shenxi Hardware Electronics Technology Co., LTD., ("Shenxi"), Dongguan Wehe Electronic Technology Co., Ltd. ("Wehe"), LSM Technology, Ltd., ("Laisimo"), ACM Supplies, Inc. ("ACM"), Global Vaping LLC., ("GV"), and Does 1 through 50, (collectively, "Defendants"), in the United States District Court for the Northern District of California.  (Dkt. No. 1.)  ACM, Ou, and Sigelei filed a motion to dismiss for insufficient service of process and a motion to change venue to the United States District Court for the Central District of California on July 20, 2016.  (Dkt. Nos. 17, 18.)  On August 2, 2016, Plaintiffs filed an Amended Complaint, alleging twenty-three causes of action—including various statutory and common law trademark and copyright infringement claims, as well as claims for fraud, misrepresentation, breach of contract, and unfair business competition under California law. ("FAC," Dkt. No. 19.)  The FAC also adds Isaac Walker as a defendant. (Id.)

CIVIL MINUTES—GENERAL                        Initials of Deputy Clerk MG

On December 5, 2016, U.S. District Judge Edward J. Davila granted Defendants' motion to change venue and the motion for joinder, denied Plaintiffs' motion to strike, and terminated and vacated all pending matters. (Dkt. No. 46.) Judge Davila directed the parties to re-file such matters before the newly assigned district judge. (Id.) The matter was transferred to this Court on December 7, 2016. (Dkt. Nos. 47 & 48.) On January 6, 2017, Defendants filed a renewed motion to dismiss under Rules 12(b)(5) and 12(b)(1). (Dkt. No. 56.) This Court denied Defendants' motion to dismiss on February 3, 2017. (Dkt. No. 62.)

On March 15, 3017, Plaintiffs filed a Motion for Preliminary Injunction. ("Motion," Dkt. No. 73.) In support of the Motion, Plaintiffs filed the following documents:

- Declaration of Hsueh Cheng Yin (Yin Decl., Dkt. No. 73-1), which includes
  - Certificate of Registration for "Asmodus" Trademark issued by the United States Patent and Trademark Office ("USPTO") as Exhibit A ("Asmodus Name Reg.," Dkt. No. 73-1, Ex. A at 17);
  - Certificate of Registration for the Asmodus Logo issued by the USPTO as Exhibit B ("Asmodus Logo Reg.," Id. at Ex. B, 20)
  - Certificate of Registration from the Register of Copyrights for the Snow Wolf 2-D artwork as Exhibit C ("SW Copyright Reg.," Id. at Ex. C, 23);
  - Certificate of Registration for "Minikin" Trademark issued by the USPTO as Exhibit D ("Minikin Reg.," Id. at Ex. D, 25);
  - Certificate of Registration for "Helve" Trademark issued by the USPTO as Exhibit E (Helve Reg., Id. at Ex. E, 27);
- Declaration of Jayson Sy (Sy Decl., Dkt. No. 73-2);
- Declaration of Renson Lee (Lee Decl., Dkt. No. 73-3), which includes
  - Invoice for black Helve and Minikin units sold by Shenxi Technology Co. dated April 18, 2016 as Exhibit 1 (Id. at Ex. 1);
  - Copy of wire transfer from Renson Lee to Shenxi's bank account dated April 21, 2016 as Exhibit 2 (Id. at Ex. 2); and
- Declaration of Tony Tran (Tran Decl., Dkt. No. 73-4).

Defendants filed their Answer on March 27, 2017, which contained forty affirmative defenses. (Dkt. No. 80.) Along with their Answer, Defendants filed a counterclaim, alleging the following causes of action: (1) fraud against Asmodus, Yin, and Yin's wife, Eileen Ting Fan ("Fan") (Id. at 43); (2) breach of contract against Yin (Id. at 44); (3) breach of fiduciary duty against Yin and Fan (Id. at 45); and (4) declaratory relief. (Id. at 46.) On March 27, 2017, Defendants also filed an Opposition to Plaintiffs' Motion, ("Opposition," Dkt. No. 81), attaching the following documents in support:

- Declaration of Junbiao Ou (Ou Decl., Dkt. No. 81-1), which includes
  - A copy of the "Snowwolf Wolfhead Design" created by Sigelei as Exhibit A (Id. at Ex. A);

- o Trademark Application Status Report for Snow Wolf submitted to the Chinese Trademark Authority "[i]n 2013" as Exhibit B (Id. at Ex. B);
- o English Translation of the Chinese Trademark Authority Registration Application Status for Snow Wolf as Exhibit C (Id. at Ex. C);
- o Chinese Trademark Authority Registration Certificate for Snow Wolf Trademark as Exhibit D (Id. at Ex. D);
- o Certificate of Registration for "Snowwolf Reg. No. 4,691,744" issued by the USPTO as Exhibit E (Id. at Ex. E); and
- o Statement of Information for Asmodus dated October 17, 2014 purportedly provided to Junbiao Ou by Yin and Fan as Exhibit F (Id. at Ex. F.)

On April 3, 2017, Plaintiffs filed their Reply to Defendants' Opposition. ("Reply," Dkt. No. 86.) In support, Plaintiffs filed the Declaration of Hsueh Cheng Yin, (Yin Decl. II, Dkt. No. 86-1), which includes the following Exhibits:

- Copy of the Notice of Appearance for Wehe and Ou's counsel, Lin Bin, to show that Wehe is controlled by Ou, as Exhibit 1 (Id. at Ex. 1);
- Joint Case Management Statement as Exhibit 2 (Id. at Ex. 2);
- filings in these proceedings as Exhibits 3 and 4 (Id. at Exs. 3, 4);
- Trademark Registration for Wehe issued by the USPTO listing Ou as the company's registered owner as Exhibit 5 ("Wehe Reg.," Id. at Ex. 5);
- Trademark Certification for Wehe issued by the United Kingdom trademark authorities listing Shenxi as Wehe's registered owner as Exhibit 6 ("Wehe UK Reg.," Id. at Ex. 6);
- Certificate of Registration for Sigelei issued by the USPTO listing Junbiao Ou as the registered owner and Wehe's address listed on its U.S. registration certificate as Exhibit 7 (Id. at Ex. 7);
- Certificate of Registration for Global Vaping issued by the USPTO listing Junbiao Ou as the registered owner and Wehe's address on its U.S. registration certificate as Exhibit 8 (Id. at Ex. 8);
- Certificate of Registration for IPV issued by the USPTO listing Junbiao Ou as the registered owner and Wehe's address on its U.S. registration certificate as Exhibit 9 (Id. at Ex. 9); and
- Certificate of Registration for Laisimo issued by the USPTO listing Junbiao Ou as the registered owner and Wehe's address on its U.S. registration certificate as Exhibit 10 (Id. at Ex. 10.)

The Parties also filed requests to cross-examine each other's Declarants. (Dkt. Nos. 85, 88.) The Court granted Plaintiffs' request, and granted Defendants' request in part. (Dkt. No. 106.) A hearing on Plaintiffs' motion was held on April 24, 2017. At the hearing, the Court directed the Parties to focus their questioning on: (1) any evidence of Ou's ownership interest in Asmodus, (2) whether Defendants claimed they were authorized by Yin to use the marks or that they did not need authorization by virtue of Ou's ownership interest in Asmodus, and (3) whether the Helve and Minikin marks ever used in commerce prior to their use under the

Asmodus name and/or copyrighted logo.  As the hearing drew to a close, the parties were directed to file supplemental briefing to further address these issues.

On April 28, 2017, Defendants filed their supplemental opposition to Plaintiff's Motion. ("Supp. Opp'n," Dkt. No. 112.)  In support, Defendants attached a Supplemental Declaration of Junbiao Ou and the Reporter's Transcript of the April 24, 2017 hearing. (Ou Supp. Decl., Dkt. No. 112-1; "Transcript," Dkt. No. 112-3.)  Plaintiffs also filed their supplemental briefing on April 28, 2017, ("Supp.," Dkt. No. 113), attaching the Asmodus, Helve, and Minikin registration certificates issued by the USPTO as Exhibits A through D.  (Dkt. Nos. 113-1 through 114-4.)

## B. Factual Allegations and Claims

This trademark infringement and fraud-related action arises out of a business collaboration between Yin and Ou gone wrong.  Yin and Ou are both in the business of developing, marketing, and selling e-cigarette products.  Sigelei, Laisimo, Shenxi, and Wehe are companies allegedly controlled and owned by Ou.  (Mot. at 13.)  According to Plaintiffs, Ou employs these "alter ego" companies to exploit Asmodus's trademarks and goodwill by passing off their products as genuine Asmodus products.  (Id. at 16.)  As such, Plaintiffs allege twenty-three causes of action against Defendants Junbiao Ou, Isaac Walker and Ou's companies, Sigelei, Laisimo,  Shenxi, and Wehe (collectively, "alter ego companies.") (FAC at 21-46.)[1]

---

[1] (1) statutory trademark infringement against Ou and the alter ego companies under 15 U.S.C. § 1114 (FAC at 21-23); (2) common law trademark infringement of the Snow Wolf Trademarks against Ou and alter ego companies (Id. at 23-24); (3) common law trademark infringement of the Minikin Trademark against Ou and alter ego companies, (Id. at 24-26); (4) common law trademark infringement of the Helve Trademark against Ou and alter ego companies (Id. at 26-27); (5) trademark cancellation against Sigelei (Id. at 27-28); (6) violation of the Lanham Act Section 43(a) against Ou and alter ego companies, 15 U.S.C. §1125(a) (Id. at 28-30); (7) copyright infringement against Ou and alter ego companies (Id. at 30-32); (8) trade libel against Ou and alter ego companies (Id. at 32); (9) violation of California's unfair competition law against Ou and alter ego companies (Id. at 33-34); (10) common law unfair competition claim against Ou and alter ego companies (Id. at 34); (11) breach of oral contract against Ou, Sigelei, and Laisimo (Id.); (12) fraud against Ou, Sigelei, and Laisimo (Id. at 35); (13) fraudulent misrepresentation against Ou, Sigelei, and Laisimo (Id. at 36); (14) negligent misrepresentation against Ou, Sigelei, and Laisimo (Id. at 37); (15) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Ou and alter ego companies, 18 U.S.C. §§ 1962(c) and 1964(c) (Id. at 38-40); (16) conspiracy to violate RICO against Ou and alter ego companies, 18 U.S.C. §§ 1962(d) and 1964(c), (Id. at 40-41); (17) unjust enrichment against Ou and alter ego companies (Id. at 41); (18) breach of oral contract against Ou (Id. at 41-42); (19) fraud against Ou (Id. at 42-43); (20) fraudulent misrepresentation against Ou (Id. at 43); (21) negligent misrepresentation against Ou (Id. at 44);  (22) statutory trademark infringement against Isaac Walker, 15 U.S.C. § 1114 (Id. at 44-45); and (23) common law trademark infringement of the Snow Wolf Trademarks against Isaac Walker. (Id. at 46)

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

Ou and Eddie Yin met at a convention for vaporizer industry insiders in Las Vegas, Nevada in March of 2014. (FAC ¶ 34; Ou Decl. ¶ 10.) At the conference, Ou and Yin discussed a collaboration to manufacture and distribute e-cigarettes in the United States market. (FAC ¶ 35; Ou Decl. ¶ 12.) Ou and Yin disagree on the terms of this venture. According to Yin, these discussions culminated in an agreement whereby Ou would provide Yin with IPV vaping products, and Yin would promote IPV and distribute IPV products as Ou's exclusive U.S. distributor. (FAC ¶ 35.) According to Ou, Yin proposed that they form a new corporation together to distribute Sigelei products and to serve as the post sales customer service center for the products. (Ou Decl. ¶ 11.) Ou maintains that Yin represented that Ou would be a 49 percent shareholder in this new corporation that they would jointly operate and control. (Id.) According to Ou, moreover, Yin presented various documents, including a statement of information for Asmodus, reflecting Ou's 49 percent stake and his position as officer of Asmodus. (Ou Decl. ¶ 16.) To substantiate this assertion, Ou contends that his company, Sigelei supplied Asmodus with millions of dollars of product on a consignment basis at the most favorable wholesale prices. (Id. at ¶¶ 21, 22.)

Yin, on the other hand, declares that Ou never invested in Asmodus because they could not reach a final agreement on the terms under which Ou would acquire a 49 percent stake in Asmodus. (Yin Decl. II ¶ 29.) Yin states that he formed Asmodus Inc. to develop his own product lines, but that he never received products "on consignment" and never earned a commission. (Id. at ¶ 26.) In fact, Yin maintains that he paid for the products that Ou manufactured for him when he purchased them and not after they were sold. (Id.)

The business collaboration was fruitful during the spring and summer of 2014. After Yin incorporated Asmodus, Asmodus began distributing IPV products in addition to the Snow Wolf product line. (FAC ¶ 36.) As distributor of Sigelei vaping products, Yin served as Sigelei's U.S. warranty and service center as long as Sigelei paid Asmodus for the costs of replacement parts and units. (Id. at ¶ 42.) Yin describes how through the collaborative efforts of himself and Ou, the Snow Wolf vaporizer "was wildly popular and successful," and Asmodus "made a name for itself as a premier distributor of high quality vaping products." (Id. at ¶ 38.) IPV's Pioneer4You brand had also become a highly popular name brand in the vaping market. (Id. at ¶ 39.) Nevertheless, in or around September 2014, Ou allegedly began to delay shipments to Yin in a purported effort to take back the U.S. distribution rights of its Pioneer4You products from Yin. (Id. at ¶ 42.) Yin alleges Ou exploited his considerable leverage, and "[i]n an effort to apply pressure, Sigelei stopped shipment of Snow Wolf vaping products to Asmodus altogether." (Id. at ¶ 47.)

Throughout this time, Yin continued to promote and provide consumer-related services to Ou and his companies. (Id.) Yin was also continuing to design and develop Asmodus's e-cigarette brands and products. (Id.) Asmodus introduced its Helve vaping products in or around December 2015. (Yin Decl. ¶ 28; Ou Decl. ¶ 36.) The parties' relationship began to deteriorate in early 2016. According to Yin, Ou's companies ceased shipments of Asmodus products and stopped paying Yin for the warranty services he had been providing for Sigelei products. (FAC ¶ 49.) Throughout this time, Ou and his companies were allegedly selling counterfeit Asmodus

products, including the Minikin and Helve lines.  (Yin Decl. ¶¶ 20-24.)  In or around February 2016, Yin traveled to China to meet with Ou, and they met again in March 2016 in Rancho Cucamonga, California in an effort to mend their relationship. (FAC ¶ 48.)

According to Ou, however, the business relationship was severed in March of 2016 when Yin informed him that he had been "removed" as a director and officer of Asmodus unilaterally because he had never made any type of cash contribution.  (Ou Decl. ¶ 46.)  Ou maintains that any Asmodus products sold by his companies were genuine: the Minikin and Helve products were manufactured by Wehe with Asmodus's and Yin's express authorization, and Asmodus consented to ACM's acquisition of Helve and Minikin products for distribution in the United States.  (Id. at ¶¶ 38, 42.)  In short, Ou maintains that any products sold by his companies bearing "Asmodus," "Helve," or "Minikin," were either expressly authorized by Asmodus or were remaining inventory that Ou had to sell to recoup his losses as a result of Yin's breach of their agreement.  (Id. at ¶ 55.)[2]

Again, Yin maintains that Ou never had shares in the company, and while at one point, he granted Ou's companies a limited license to manufacture products bearing the Minikin, Helve, and Asmodus marks for his own company's exclusive sale and distribution, he "never orally or in writing, expressly or implicitly, granted to" Ou or his affiliates, the right to sell any products under the Minikin, Helve and Asmodus trademarks.  (Yin Decl. II ¶ 2.)  Yin further maintains that he is not aware of any documents, actions or statements of his that would support any "understanding" on the part of Ou that he or ACM Supplies were ever authorized to sell products bearing the trademarks Minikin, Helve, and Asmodus.  (Id. at ¶ 4.)  In any event, there is evidence that Ou and his alter ego companies are continuing to sell these counterfeit Asmodus products in the United States, which have turned up as recently as March 25, 2017.  (Id. at ¶ 20.)

Plaintiffs now move for a preliminary injunction, enjoining Ou and his alter ego companies from doing, the following, pending a final judgment in this case:

> (i) referencing, mentioning, and/or using in any way Plaintiffs' ASMODUS Word and Design trademarks (collectively "ASMODUS Trademarks"), ASMODUS design Copyright, MINIKIN Trademark, and/or HELVE Trademark in connection with the sale of products (Mot. at 2);
> (ii) referencing, mentioning, and/or using in any way Plaintiffs' ASMODUS Trademarks,

---

[2] Not only do the parties dispute the nature of their relationship but they also dispute who conceived of the Asmodus product lines.  Ou declares that he created and developed the Snow Wolf line of e-cigarettes in 2013.  (Ou Decl. ¶ 6.)  Yin, on the other hand, maintains that while the Snow Wolf vaping product was manufactured by Sigelei, it was designed and commissioned by Asmodus.  (Yin Decl. ¶ 37.)  Nonetheless, on or about July 2, 2014, Yin alleges Sigelei secretly applied for a federal trademark registration of the prized Snow Wolf word mark with the USPTO. (Id. at ¶ 45.)

ASMODUS design Copyright, or MINIKIN and/or HELVE marks or any other trademark confusingly similar to the ASMODUS marks, ASMODUS' design copyrights, and/or MINIKIN or HELVE marks (Id.);

(iii) copying or reproducing, in whole or in part, any text, photographs, graphics, or other copyrighted expression from ASMODUS' design Copyright (Id.);

(iv) selling, advertising, making any other use of a design, pattern, signal, mark displayed upon digital screens, or packaging that is confusingly similar to the ASMODUS Trademarks, ASMODUS design Copyright, and/or Plaintiffs' MINIKIN and/or HELVE marks, including the products currently sold by Defendants that display the ASMODUS Trademarks, as well as Plaintiff's MINIKIN and HELVE marks (Id. at 3);

(v) advertising, marketing, or describing products displaying, or otherwise making any use of the ASMODUS Trademarks, the ASMODUS design Copyright, and/or Plaintiffs' MINIKIN and/or HELVE trademarks, in any manner likely to mislead consumers as to the source of such products and/or their affiliation with Asmodus (Id.);

(vi) interfering with Asmodus' relationships with its members, distributors, customers, marketers, including, without limitation, by contacting Asmodus' existing members, distributors, customers and marketers for the purpose of soliciting business or making false or misleading statements or otherwise discussing Asmodus or its products and trademarks with such members, distributors, and marketers (Id.);

(vii) using or referring to Plaintiffs' trademarked names and/or likenesses for any commercial purpose (Id.); and

(viii) posting, maintaining, displaying or performing promotional videos or advertisements for products that contain, display, or otherwise make use of ASMODUS Trademarks, ASMODUS copyrights, and/or Plaintiffs' MINIKIN and HELVE trademarks, including, without limitation those posted on Defendants' websites, including, but not limited to, Sigelei's website. (www.sigelei.com), Laisimo's website, and/or Global Vaping's website (www.globalvaping.com)(Id.);

(ix) immediately ceasing and desisting from the production and/or sale of any counterfeit products, which display or make any use of the ASMODUS Trademarks, ASMODUS Copyrights, and/or the MINIKIN and/or HELVE trademarks.  (Id. at 4.)

Plaintiffs also seek a preliminary injunction ordering Ou and his alter ego companies to do the following, pending a final judgment in this case:

(i) turn over and deposit with the Court or Plaintiffs' Counsel all existing products in their possession, custody, or control that display or otherwise make any use of the ASMODUS Trademarks, or MINIKIN or HELVE trademarks, or the ASMODUS Copyright;

(ii) post a notice on the home pages of all Defendants' websites, stating both in English and Chinese, that:

This Company has been required by the United States District Court for the Central District of California to post this notice in order to avoid further confusion in the marketplace. The ASMODUS, MINIKIN, and HELVE products formerly

sold through this website have no affiliation with genuine ASMODUS products
that bear or display ASMODUS, MINIKIN, or HELVE Trademarks. The Court
has ordered that this Company may no longer sell ASMODUS, MINIKIN, or
HELVE products in order to avoid confusion between those products and those
sold by ASMODUS, Inc.

(Id. at 4.)  Defendants oppose the Motion on various grounds, each of which the Court addresses
below.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions.  Fed. R.
Civ. P. 65(a).  Plaintiffs seeking injunctive relief must show that (1) they are likely to succeed on
the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3)
the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  Toyo
Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc., 609 F.3d 975, 982 (9th Cir. 2010) (citing
Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)).

Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, the four
"elements of the preliminary injunction test are balanced, so that a stronger showing of one
element may offset a weaker showing of another."  Alliance For The Wild Rockies v. Cottrell,
632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "a preliminary injunction could issue where the
likelihood of success is such that 'serious questions going to the merits were raised and the
balance of hardships tips sharply in [plaintiff's] favor.' "  Id. at 1131–32.  Put differently, "
'serious questions going to the merits' and a hardship balance that tips sharply toward the
plaintiff can support issuance of an injunction, assuming the other two elements [likelihood of
irreparable injury and public interest] of the *Winter* test are also met."  Id. at 1132.

A preliminary injunction can take two forms: either a prohibitory injunction or a mandatory
injunction.  Chalk v. U.S. Dist. Court Cent. Dist. of California, 840 F.2d 701, 704 (9th Cir. 1988).
A prohibitory injunction prevents a party from taking action pending a resolution on the merits,
(Heckler v. Lopez, 463 U.S. 1328, 1333 (1983) (stating that a prohibitory injunction "freezes the
positions of the parties until the court can hear the case on the merits")), while a mandatory
injunction "orders a responsible party to take action."  Meghrig v. KFC W., Inc., 516 U.S. 479,
484 (1996).  By requiring a nonmovant to take affirmative action, the mandatory injunction "goes
beyond simply maintaining the status quo."  Anderson v. United States, 612 F.2d 1112, 1114 (9th
Cir. 1980).

## III. DISCUSSION

Plaintiffs assert that they are entitled to a preliminary injunction enjoining Defendants from
continuing to use the Asmodus, Helve, and Minikin marks (the "Marks") because they meet the
four criteria for injunctive relief: (1) they are likely to succeed on the merits of their trademark
and copyright infringement claims due to Defendants' ongoing unauthorized use of Plaintiffs'

---

Marks and logo (Mot. at 25); (2) in the absence of a preliminary injunction, Plaintiffs will suffer irreparable harm because Defendants' continued use of the Marks has "co-opt[ed] Plaintiffs' entire business, including their products, copyright, and customers," damaged Plaintiffs' "goodwill and reputation, misled customers and taken substantial steps toward destroying the value of the Asmodus brand" (Id. at 29); (3) the balance of equities favors Plaintiff because in the absence of an injunction Plaintiffs stand to lose their entire business while the only harm Defendants will suffer is that they will unable to continue to profit from infringing the Asmodus Marks and Copyrights (Id. at 30); and (4) an injunction is in the public interest because "Defendants are misappropriating [Plaintiffs' trademarks and copyrighted original expression] for their own benefit in order to further their consumer confusion scheme and defraud the public." (Id. at 31.)

Defendants, on the other hand, argue that Plaintiffs fail to show they are likely to succeed on the merits on the following grounds: (1) as manufacturers, "Defendants are presumed to own the trademarks in Asmodus, Helve and Minikin Marks," (Opp. at 10), (2) there is no evidence that Defendants have used any of the Marks without consent, (Id.) ("Yin's declarations clearly state that Defendants were authorized to manufacture and co-brand with Asmodus during their joint venture period"); (3) Defendants' use is protected under the First Sale Doctrine or falls outside the Lanham Act's reach as "genuine grey market goods," and (4) the copyright infringement claim fails to identify "which product infringes or how any product infringes on any copyright [sic] artwork." (Id. at 12.)

Second, Defendants maintain that Plaintiffs cannot show irreparable harm because: (a) Plaintiffs' loss claims that rely on projected loss of revenue are unsubstantiated and should be disregarded, (b) Plaintiffs' repeated delays in bringing this Motion preclude a finding of irreparable harm," and (c) "Plaintiffs have not alleged any facts to indicate that any infringing activity is presently occurring or is likely to occur in the future." (Id. at 13, 14.) Third, Defendants argue the dearth of evidence of consumer confusion and the terms of the injunction requiring Defendants to recall and turn over all alleged products, and "compelling speech," are "both unreasonable and impose undue hardship." (Id. at 15.) On these bases, Defendants maintain that the requested preliminary injunction does not serve the purpose of preserving the status quo and the balance of equities, therefore, tips in their favor. (Id. at 15-16.) Fourth, Defendants argue that a preliminary injunction is not in the public interest because it "would only be a waste of judicial resources," and "deny the public access to legitimate consumer goods with no justification at all." (Id. at 16.) Lastly, Defendants request that in the event Plaintiffs' Motion is granted, Plaintiffs should be required to post a bond of $500,000.00 to pay the costs and damages likely to be sustained by Defendants as a result of being wrongfully enjoined. (Id. at 16-17.)

## A. Likelihood of Success on the Merits

To satisfy the first requirement under Winter, Plaintiffs must show they have a likelihood of succeeding on the merits of their trademark and copyright infringement claims.

---

**CIVIL MINUTES—GENERAL**

### 1. Trademark Infringement

To establish a likelihood of success on the merits for the trademark infringement claim, Plaintiffs must show that they are "(1) the owner[s] of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark."  Grocery Outlet, Inc. v. Albertson's, Inc., 497 F.3d 949, 951 (9th Cir. 2007) (per curiam).

### a. Ownership

Here, Plaintiffs have shown that they are the owners of numerous marks associated with the Asmodus brand.  Based on the evidence presented, it appears that Defendants were initially authorized to use such marks under an exclusive distribution/manufacturing agreement, but then exceeded this limited license by manufacturing products displaying Plaintiffs' marks and distributing them to Plaintiffs' competitors without Plaintiffs' knowledge or consent.  While Defendants claim that they were authorized to sell genuine Asmodus products or alternatively, that Ou actually came up with the Asmodus Wheel Logo, the Court does not find Ou's declarations to be particularly credible.  For one thing, there would be no need to obtain Yin or Asmodus's consent to use the Asmodus marks if Ou actually developed the Marks himself.  Further, it is highly unlikely that Yin would agree to license his marks to Ou or his alter ego companies so competing identical products could be sold to rival distributors without Yin receiving any royalties or consideration for the purported assignment of Asmodus's exclusive rights.  That said, as the parties moving for a preliminary injunction, Plaintiffs bear the burden of proof that they are likely to succeed on the merits.  Defendants appear to contest Plaintiffs' rightful ownership of the Marks in question.  On that basis, the Court first addresses whether Plaintiffs have adequately demonstrated their own rights to use the Asmodus Marks.  This inquiry turns on which party was the first to use the marks in commerce.

The Lanham Act provides that: "The owner of a trademark used in commerce may apply to register his or her trademark under this chapter on the principal register hereby established...." 15 U.S.C. § 1051(a)(1).  Nevertheless, trademark ownership rights go to the "first-to-use, not [the] first-to-register."  2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 16:18 (4th ed.2010).  Despite the general rule that trademark ownership rights go to the first user,  2 McCarthy , § 16:18, when a trademark is registered on the USPTO's principal register (the "register"), the Lanham Act provides that the registration "shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce...."  15 U.S.C. § 1115(a).

The Court is persuaded that the evidence presented sufficiently establishes that Plaintiffs are the rightful owners of the trademarks to the Asmodus name and Asmodus logo.  (See Asmodus Name Reg.; Asmodus Logo Reg.)  Plaintiffs have provided various certificates of registration identifying either Hsueh Cheng Yin or Asmodus as the registered owners of the Marks.  The date of first use for the Asmodus logo and name is April 2014.  (Id.)  While Defendants appear to suggest that Plaintiffs engaged in fraud—by representing that Ou was an officer and 49 percent

shareholder of Asmodus in order to induce him into entering a joint venture—this is not the type of fraud whereby Plaintiffs' trademarks may be found invalid.  To escape liability on the basis of fraud for the alleged infringement of Plaintiffs' Asmodus marks, Defendants must show that Yin "knowingly ma[de] a false, material misrepresentation of fact in connection with [his] application."  See Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q. 2d 1899, 1905 (T.T.A.B. 2006).  There is nothing in the record to indicate that in April of 2014, the time that Yin filed his trademark application for the Asmodus marks, he made a material misrepresentation in a "deliberate attempt to mislead the [USPTO]."  Orient Exp. Trading Co., Ltd. v. Federated Dep't Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988).

Plaintiffs have also presented certificates of registration for the Minikin and Helve marks. (See Minikin Reg.; Helve Reg.)  The certificates show that Plaintiffs applied for trademark protection for these Marks on April 19, 2016, with a first use date of October 2015 and December 2015, respectively.  (Id.)  That said, Ou maintains that he "agreed to help Yin and Asmodus develop the product with the new brand name Minikin and new brand name Helve" in April of 2015.  (Ou Decl. ¶ 36.)  As discussed, Ou claims that as the manufacturer, the law presumes the trademarks in the Helve and Minikin branded products belong to his companies.

Plaintiffs, as registered owners, are presumed to own the Helve and Minikin trademarks, dating to the filing date of the application for federal registration.  Vuitton et Fils S.A. v. J. Young Enterprises, 644 F.2d 769, 775-76 (9th Cir. 1981).  But if Ou can establish priority of use, the presumption in favor of Plaintiffs' ownership of the Marks can be rebutted.  Indeed, to acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.  Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir.), as modified, 97 F.3d 1460 (9th Cir. 1996).

When disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights.  Sengoku, 96 F.3d at 1220.  In the absence of an agreement between the parties, the manufacturer is presumed to own the trademark.  Id.  This presumption applies with equal force to cases involving foreign manufacturers.  Id.  Still, the presumption in favor of the manufacturer is rebuttable.  In fact, there is ample precedent holding that an exclusive distributor may acquire trademark rights superior to those of the manufacturer.  See Menendez v. Holt, 128 U.S. 514 (1888); see also Blue Bell, Inc. v. Farah Manufacturing Co., Inc., 508 F.2d 1260, 1265 (5th Cir. 1975) ("The exclusive rights to a trademark belongs to one who first uses it in connection with specified goods.").

When there are competing claims of ownership between a distributor and a manufacturer, courts look to various factors when determining which party has the superior right of ownership, including:

> (1) which party invented and first affixed the mark onto the product;
> (2) which party's name appeared with the trademark;
> (3) which party maintained the quality and uniformity of the product; and

(4) with which party the public identified the product and to whom purchasers made complaints.

Sengoku, 96 F.3d at 1220.  Courts also consider which party possesses the goodwill associated with the product, or which party the public believes stands by the product.  Id.  Here, Ou acknowledges that ACM sold a few hundred sets of Minikin and Helve products.  (Ou Decl. ¶ 49.)  He also points out that no federal trademarks existed for these products at the time of these sales.  (Id. at ¶ 15.)  In short, Ou's understanding is "that other than the Minikin and Helve products manufactured in 2015/2016, which were manufactured and sold under the express authorization of Asmodus, [] no new products are currently being manufactured, imported, distributed or sold with the name Helve or Minikin by Me, Sigelei, Shenxi or Global Vaping, ACM Supplies."  (Id. at ¶ 55.)

On these facts, it is undisputed that the first use of the Helve and Minikin marks in commerce were under Asmodus's name.  It is also undisputed that Asmodus maintained the quality and uniformity of the products once imported into the U.S. because Asmodus served as the warranty servicer.  (Ou Decl. ¶ 34; FAC ¶ 49.)  Plaintiffs have proffered declarations demonstrating that the public associates Helve and Minikin with Asmodus.  (See, e.g., Tran Decl.)  Accordingly, it appears that Asmodus has the superior right of ownership because: (a) the certificate of registration indicates that Asmodus commissioned the Asmodus Logo as a work for hire, (b) Asmodus or Yin are the registered owners of the Helve and Minikin marks, (c)  the first use of those marks in commerce was under Asmodus's brand since there is nothing in the record to suggest that Ou's alter ego companies were selling the Helve and Minikin brands in the U.S. under either the ACM or Wehe brands prior to October 2015, (d) Asmodus maintained the quality and uniformity of Asmodus branded products, and (e) Defendants fail to rebut Plaintiffs' evidence that customers associate the products with Asmodus.  Sengoku, 96 F.3d at 1220.

As such, Plaintiffs have adequately demonstrated that they are the superior and rightful owners of the Asmodus, Helve, and Minikin marks.  Now that they have demonstrated their protectable interest in the marks, the Court must now find Defendants' use likely to cause consumer confusion for Plaintiffs' to show a high probability of success on the merits for their trademark infringement claims.  Dept. of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006).

### b. Likelihood of Confusion

"Likelihood of confusion exists when consumers viewing the mark would probably assume that the goods it represents are associated with the source of a different product identified by a similar mark."  KP Permanent Make–Up, Inc. v. Lasting Impression 1, Inc., 408 F.3d 596, 608 (9th Cir. 2005).  The Ninth Circuit employs an eight factor test to determine whether a likelihood of confusion exists: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other

markets (the <u>Sleekcraft</u> factors).   <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341 (9th Cir. 1979) <u>abrogated by</u> <u>Mattel, Inc. v. Walking Mountain Prods.</u>, 353 F.3d 792 (9th Cir. 2003); <u>see also</u> <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1205 (9th Cir. 2000).  "The strength of a given mark rests on its distinctiveness."  <u>Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.</u>, 856 F.2d 1445, 1448 (9th Cir. 1988).  Courts also consider whether the mark has acquired secondary meaning, that is "its degree of recognition in the minds of the relevant customer class."  <u>Id.</u> at 1449.

First, the Court evaluates the strength of the Marks.  In this case, the Court finds that the Asmodus name and logo are unique and entitled to more protection than if the design and word were merely generic or descriptive.  Moreover, the wheel logo has no commonly known connection with e-cigarettes and "Asmodus" is not a common word or coined phrase. <u>Dreamwerks Production Group, Inc. v. SKG Studio</u>, 142 F.3d 1127, 1129 (9th Cir. 1998). According to Yin's sworn declaration "the name [was] derived from combining Mod and US in one word. . . as-Mod-Us."  (Yin R. Decl. ¶ 34.)   The Asmodus Logo is also distinctive in that it is non-functional and the choice of a wheel painted in brush stroke is at least fanciful or arbitrary. (<u>See</u> Asmodus Logo Reg.) (describing the protected mark as "brushstroke, circular design forming an outer circular border, and the word 'Asmodus' is positioned in a circular seal on the inside of the circle").  Accordingly, the Court finds the strength of the marks at issue here also favors a finding of likelihood of confusion.

The Court is persuaded Plaintiffs' evidence demonstrates sufficient proximity and relatedness between the parties' products.  "Goods are proximate or related if they 'are similar in use and function, and 'would reasonably thought by the buying public to come from the same source if sold under the same mark.'"  <u>Aurora World, Inc. v. Ty, Inc.</u>, 719 F. Supp. 2d 1115, 1160 (C.D. Cal. 2009) (quoting <u>Sleekcraft</u>, 599 F.2d at 348 n. 10, 350).  The Court also concludes that Plaintiffs establish sufficient similarity, as the marks on Defendants' products are identical to Asmodus's.  The Minikin and Helve products that are sold under the Wehe brand are identical to the genuine Asmodus products.  Plaintiffs provide photos of the counterfeit Minikin and Helve products alongside the genuine ones.  Indeed, Defendants' products are marketed as genuine Asmodus products because they display the Asmodus Logo, as well as the Minikin and Helve marks.  (<u>See</u> Yin Decl. ¶¶ 26, 27.)  "Goods are proximate or related if they 'are similar in use and function, and 'would reasonably thought by the buying public to come from the same source if sold under the same mark.'"  <u>Aurora World, Inc. v. Ty, Inc.</u>, 719 F. Supp. 2d 1115, 1160 (C.D. Cal. 2009) (quoting <u>Sleekcraft</u>, 599 F.2d at 348 n. 10, 350).  It is undeniable that the products have the same uses and functions.  As to the second and third <u>Sleekcraft</u> factors, Plaintiffs' evidence favors finding a high likelihood of consumer confusion.

The fourth and fifth factors also favor injunctive relief.  There is evidence of actual confusion and the parties' marketing channels overlap.  For this inquiry, the Court must consider "whether the predominant purchasers of the parties' goods are similar or different, and whether the parties' marketing approaches resemble one another."  <u>Aurora World, Inc. v. Ty, Inc.</u>, 719 F. Supp. 2d 1115, 1162 (C.D. Cal. 2009).  The greater degree of overlap, the more likely there is to be confusion.  <u>Sleekcraft</u>, 599 F.2d at 353.  In this case, Defendants appear to target the same

marketing channels as Plaintiffs because these allegedly counterfeit products have ended up in Plaintiffs' customers' hands.  For instance, Renson Lee, the owner of Ultramist Vape Shop, ordered Minikin and Helve products from Shenxi, which were sent in a box that read "customer: Asmodus," with a shipping label listing "Wehe" as the origin, and a seal that had Sigelei's watermark. (Lee Decl. ¶¶ 9, 10, 11.)  Jason Sy, who owns Pure Vapor in Torrance, purchased Minikin vaporizers from Sigelei displaying Asmodus marks. (Sy Decl. ¶ ¶ 3, 7.)  What's more, Nana, a sales associate at Sigelei, provided Junbiao Ou's bank account number to Sy when directing him where to deposit payments. (Id. at ¶¶ 3, 4.)  When Pure Vapor received its order of Minikin vaporizers on May 10, 2016, the return address on the package listed "ACM Supplies," with an address of a warehouse in Ontario, California leased by Ou. (Id. at ¶ ¶ 7, 8.)  The package contained Asmodus Helve vaporizers in the glossy blue color, which are the vaporizers Plaintiffs ordered but never received. (Id. at ¶ 9.)

Sixth, the Court need consider the type of goods and the degree of care likely to be exercised by the purchasers.  While it appears that customers ordinarily exercise a high degree of care in purchasing these high-end vaporizers, Plaintiffs have put forth evidence of actual confusion.  For instance, Yin has found "[h]undreds, if not thousands of blog postings across the vaping industries filled with customers asking whether they bought real or fake Minikin or Helve products." (Yin Decl. ¶ 36); (see also id.) ("Is the minikin in the wehe box also a legit minikin?").  Plaintiffs' employees have even done repairs on counterfeit Asmodus products.  As such, this factor is not particularly salient here given that the record strongly suggests that: (a) Defendants are passing off unauthorized Asmodus products as their own, and (b) Plaintiffs' and Defendants' products appear to be  indistinguishable to the consumers.

Seventh, the defendant's intent in selecting the mark must also be evaluated in determining the likelihood of confusion.  "Knowing adoption of a mark that is closely similar to one that is used by another is a basis for inferring an intent to deceive the public, which is 'strong evidence of a likelihood of confusion.'"  Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1031 (C.D. Cal. 2011).  The photos Plaintiffs submitted in support of the Motion permit the Court to infer intent to deceive the public: some of the Wehe Minikin vaporizers display the original Asmodus wheel, while others display an identical wheel with "Wehemod" instead of "Asmodus." (Lee Decl. ¶ 27.)  Defendants have not submitted anything to refute the inference that they intended to use identical marks to trade off Asmodus's reputation. See Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993).  Lastly, the Court considers the likelihood of expansion of the product lines.  If it is likely that either party will expand its business to compete with the other, there is a strong possibility of consumer confusion. Sleekcraft, 599 F.2d at 354.  Since the Parties are direct competitors, this factor does not tilt the scales either way.  At bottom, the Court finds the Sleekcraft factors overwhelmingly demonstrate a high likelihood of consumer confusion.  Accordingly, the Court is persuaded that absent viable defenses—which the Court addresses below—Plaintiffs' have adequately established a sufficient risk of consumer confusion to prevail on the merits of their trademark infringement claims.

**CIVIL MINUTES—GENERAL**      Initials of Deputy Clerk MG

### 2. Copyright Infringement

#### a. Plaintiffs' Ownership of a Valid Copyright

As discussed, Plaintiffs argue they are likely to succeed on the merits of their copyright claim because Defendants "wholesale copying of original expression" to cause confusion in the marketplace, "with the goal of stealing Asmodus' goodwill," is "plainly copyright infringement." (Mot. at 28.)  To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) copying of the original elements of the protected work. See Feist Publications v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991).  "The word 'copying' is shorthand for the infringing of any of the copyright owner's ... exclusive rights, described [in section 106 of the Copyright Act]."  S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 n. 3 (9th Cir. 1989).

A copyright registration certificate is *prima facie* evidence of copyright ownership.  See 17 U.S.C. § 410(c);  Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc., 307 F.3d 775, 781 (9th Cir. 2002) (stating that a copyright "registration is considered *prima facie* evidence of the validity of the copyright").  "A certificate of copyright registration, therefore, shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights." Ets–Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1076 (9th Cir. 2000); Aurora World, Inc. v. Ty Inc., 719 F. Supp. 2d 1115, 1128 (C.D. Cal. 2009). Asmodus is listed as the registered owner of the Snow Wolf 2-D Artwork, with a first publication date of April 10, 2014. (SW Copyright Reg.)  Further, as discussed above, Plaintiffs have adequately demonstrated they authored the Asmodus Logo with a first publication date of April 2014.  As such, Plaintiffs own a valid copyright in the Snow Wolf 2-D artwork and are also copyright holders of the Asmodus wheel logo.

Under the federal Copyright Act, the owner of a copyright in a pictorial or literary work has the exclusive right to (1) reproduce the work, (2) prepare derivative works based on the work, (3) distribute copies of the work and (4) display the work publicly.  17 U.S.C. § 106.  Anyone who violates any of these exclusive rights without authorization "is an infringer of the copyright." 17 U.S.C. § 501(a).  Defendants intentionally use identical logos to promote and sell their counterfeit Snow Wolf, Minikin, and Helve vaporizers.  Plaintiffs attach photos of counterfeit Asmodus Snow Wolf products that display the Snow Wolf 2-D artwork. (Tran Decl. ¶ 8.)  The photos depict the screen of a Snow Wolf vaporizer purchased from the ebay account of Isaac Walker, which "display[ed] 'LAISIMO' and 'SNOW WOLF'" when turned on, and "Asmodus" when turned off.  (Id. at ¶¶ 10, 9.)  When the serial number was entered on Asmodus's database, it indicated that it was not an authorized Asmodus product.  (Id. at ¶ 11.) The counterfeit products are packaged in boxes that display the Asmodus wheel logo.  The reproduction, public display, and derivative use of the Asmodus artwork, therefore, violates Plaintiffs' exclusive rights as copyright holders.  The Court now turns to access and substantial similarity.

### b. Access and Substantial Similarity

For Plaintiffs to prevail on their copyright claim, Plaintiffs must demonstrate that Defendants "copied" protected elements of Asmodus's copyrighted designs. See Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996). Because direct evidence of copying is generally not available, a plaintiff can establish copying by showing that defendant had access to the copyrighted work and that the parties' works are substantially similar. Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1044 n. 2 (9th Cir. 1994); Berkla v. Corel Corp., 66 F.Supp.2d 1129, 1140 (E.D. Cal. 1999).

Access is established if "plaintiff shows that the defendant had an opportunity to view or to copy the plaintiff's work." Meta–Film Associates v. MCA, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984) (citation omitted). "Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through dealings with a publisher or record company), or (2) the plaintiff's work has been widely disseminated." Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000). It is undisputed that Defendants' had access to Plaintiffs' Asmodus Logo since Shenxi and Wehe were authorized at one point to manufacture genuine Helve products for Asmodus. (Yin Decl. ¶ 28.) Ou even states that he helped Yin develop the Asmodus branded products. (Ou Decl. ¶¶ 29, 33, 36.) The counterfeit Minikin and Helve products appeared on the market shortly after Ou claims to have been selling authorized Minikin and Helve products. Defendants' statement in the joint Rule 26(f) report states:

> A few months before the end of the collaboration, Yin and Asmodus Inc. gave Wehe a sample of Minikin in the gloss finish blue color ("Blue Minikin") and authorized Wehe to manufacture the Blue Minikin in large volume for it. Yet, when all the requested Blue Minikin products are ready, the collaboration fell apart. Wehe had no choice but to sell these genuine Blue Minikin products through itself and other companies to get the investment back.

(Dkt. No. 61, 5.)

On these facts, Plaintiffs will be able to prove access. Ou admits to being provided with a sample of the blue Minikin product. He also admits to selling this product through companies that were not authorized distributors after this business relationship fell apart. Now the Court must determine whether the artwork affixed to the counterfeit Helve and Minikin products is substantially similar to the protected expression displayed on the genuine Asmodus products. Before turning to the sources of similarity, it is useful to note that it is only the copying of protectable expression that violates a copyright holder's exclusive rights. For instance, no copyright protection can be afforded the idea of using a face of a wolf to represent a wolf. See, e.g., Satava v. Lowry, 323 F.3d 805, 810 (9th Cir. 2003) (holding that plaintiff could "not prevent others from copying aspects of his [jellyfish] sculptures resulting from . . . jellyfish physiology). The Asmodus Wheel Logo is entitled to slightly more protection since the brush stroke does not appear to be useful to the operation of a wheel, and the lettering on the inside is entirely fanciful.

Accordingly, the Snow Wolf 2-D artwork will likely be entitled to thin copyright protection, while the Asmodus Wheel Logo is likely eligible for slightly more protection.

To determine whether works are substantially similar, the Ninth Circuit uses both an extrinsic and an intrinsic test. The extrinsic test objectively considers whether there are substantial similarity in both ideas and expression, while the intrinsic test measures expression subjectively from the standpoint of the ordinary reasonable observer. <u>Cavalier v. Random House, Inc.</u>, 297 F.3d 815, 822 (9th Cir. 2002) ("The 'extrinsic test' is an objective comparison of specific expressive elements.... The 'intrinsic test' is a subjective comparison ..."). Here, we have virtual identity between the artwork displayed on the counterfeit Asmodus products and that displayed on the genuine ones. Even when the unprotectable elements are filtered out, Plaintiffs will likely be able to succeed on the merits of their copyright infringement claims. . <u>See Apple Computer, Inc. v. Microsoft Corp.</u>, 35 F.3d 1435, 1442 (9th Cir. 1994) ("The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance"). Defendants have reproduced, displayed, and created derivative works using Plaintiffs' protectable expression. Defendants have not rebutted the presumption that Plaintiffs own the copyrights in the Asmodus Designs—whether by registering the Snow Wolf 2-D artwork or through authorship of the Asmodus Logo—and there is overwhelming evidence of unauthorized and illicit copying. Accordingly, the Court is persuaded that Plaintiffs adequately demonstrate they are likely to succeed on the merits of their copyright infringement claim.

### 3. Defenses

Defendants argue that the following defenses preclude a finding that Plaintiffs are likely to succeed on the merits of their infringement claims: (a) Ou had the authority as principal of Asmodus to use the trademarks at issue in this case, (b) Ou and his companies had an implied license to manufacture and distribute products bearing Asmodus marks, and (c) Defendants are either immune from liability under the First Sale Doctrine or the products Defendants' imported were "genuine, grey market goods," and therefore not subject to infringement actions. (<u>See</u> Supp. Opp'n at 2-6.) The Court addresses each of these defenses in turn.

### a. Authority as Majority Shareholder and Principal of Asmodus

Defendants maintain that Ou, as a de facto director, had the authority to use the Asmodus marks at issue because closely held corporations traditionally operate like partnerships. (<u>Id.</u> at 3-4.) Ou's status as shareholder and officer of Asmodus is hotly disputed. To be sure, based on the record presented, it appears that after March 25, 2016, Ou was informed by Yin and his wife that he was neither a shareholder nor an officer of Asmodus. (Ou Decl. ¶ 46.) Moreover, even assuming that Ou was a majority shareholder and officer of Asmodus at the time of the allegedly infringing sales, he could not authorize his alter ego companies to use the Asmodus marks absent formal authorization from Asmodus's board of directors.

Yin is the registered owner of the Asmodus name and logo. (Name Reg; Logo Reg.) Asmodus is authorized to use the Marks through a license from Yin.  Control or ownership of Asmodus, the sublicensor, does not entitle Ou to sublicense the Asmodus marks to third parties. Courts have uniformly held "that a trademark licensee may not sub-license a mark without express permission from the licensor." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Accordingly, absent Yin's express consent, Asmodus's board of directors could not assign any rights to use the Asmodus marks.  Plaintiffs maintain that "Mr. Ou never received any authorization to use these two Asmodus trademarks from Mr. Yin, nor did he receive a license to use them from Mr. Yin."  (Supp. at 3.)  Accordingly, Ou's purported ownership and control of Asmodus provides no defense for any infringing sales of products bearing the Asmodus name and Logo.

As to the Helve and Minikin marks, Ou's purported ownership and board position is similarly deficient to absolve him or his companies of liability under the Lanham Act.  For one, it appears that all Helve and Minikins sold were accompanied by the Asmodus logo and Asmodus is the registered owner of the Helve and Minikin marks.  (Helve Reg.; Minikin Reg.)  As discussed, Defendants cannot rebut the presumption that Asmodus is the rightful owner of the Marks since there is no evidence that any entity used the Helve and Minikin marks in commerce prior to Asmodus.  The Helve and Minikin marks are therefore Asmodus's property.   Even if Ou were a majority shareholder, he could not license the Minikin and Helve marks unilaterally.  First, stockholders have no power as such to sell or authorize sale of corporate property, either individually or collectively in stockholders' meeting.  Gashwiler v. Willis, 33 Cal. 11 (1867); Nelson v. Anderson, 72 Cal. App. 4th 111, 126 (1999)("Shareholders own neither the property nor the earnings of the corporation.").  Ou even acknowledged that his authority to use the Marks could not stem solely from his purported fifty-percent ownership stake in Asmodus.  (Id. at 23:7-9.)  Nor does Ou's purported officer status grant him the authority to license the Helve and Minikin marks.  Generally, neither the president nor secretary of a corporation by virtue of his office has authority to sell or encumber assets of the corporation.  Wingate v. Bercut, 146 F.2d 725 (9th Cir. 1944); Butler v. Solano Land Co., 46 Cal. App. 171, 174 (1920) ("The president of a corporation has no power, by virtue of his office, to alienate its property.").

While in some circumstances an officer of a corporation may have implied authority to take corporate action on the corporation's behalf, this authority must arise out of the duties and responsibilities actually entrusted to him by the corporation or the duties assumed by him and acquiesced in by the corporation.  Butler, 46 Cal. App. at 174.  There is nothing in the record to support the inference that Asmodus's board of directors either entrusted to Ou the rights to alienate Asmodus's marks and license them to his own companies for free or otherwise acquiesced to this conduct.

Ou's companies directly compete with Asmodus.  Any sales of Asmodus product through Ou's other companies, therefore, would directly conflict with Asmodus's financial interests. (Supp. at 7.)  While it seems that the business relationship was based on oral agreements, was loose and evolving, and depended on quid pro quo, during the time of the allegedly infringing sales, Asmodus was receiving no benefit from Ou.  It is thus highly unlikely that the board of

directors, Yin and Ou, *mutually* intended to grant Ou the unilateral right to license Asmodus's prized marks to his own companies so Asmodus's competitors could sell Asmodus products at a discount to Asmodus's customers.  (*Id.*)  Not only is this arrangement directly at odds with Asmodus's financial interests, but it also violates basic tenets of the law of business organizations. In the context of partnerships, the status of partner, without more, provides only the authority to bind the partnership by acts "which are apparently within the usual course of the particular business" of the partnership.  Owens v. Palos Verdes Monaco, 142 Cal. App. 3d 855, 865 (1983) (quoting Ellis v. Mihelis, 60 Cal. 2d 206, 217 (1963).  A partner, without the consent of *all* of the remaining partners, has no authority to do any act which is destructive of the partnership or, indeed, any act which is not apparently done for the purpose of carrying on the partnership business in the "usual way."  Patel v. Patel, 212 Cal. App. 3d 6, 9 (1989).  Ou's acts were destructive to Asmodus's business and based on the parties' conduct in 2014 and 2015, diluting the value of Asmodus's marks by selling them under "Wehe" does not strike the Court as the parties' usual way of conducting business.

In the context of corporations, a director would breach his fiduciary duties to the corporation if he were to: (a) dispose of or sell corporate assets without board approval,  (b) execute an interested transaction without full disclosure and impartial shareholder approval, and (c) engage in business in direct competition with the corporation.  See, e.g., Cal. Corp. Code § 310; Sonista, Inc. v. Hsieh, 348 F. Supp. 2d 1089, 1093 (N.D. Cal. 2004)("As Hsieh presumptively has an interest in a company of which his wife is a controlling officer, such a transaction requires approval by disinterested shareholders or disinterested directors under California Corporations Code section 310."); Efron v. Kalmanovitz, 249 Cal. App. 2d 187 (1967)( "Where individual defendant controlled both corporate seller of assets and corporate buyer he was in effect dealing with himself.").  In short, the law provides no support for the argument that Ou, by virtue of his status as principal of Asmodus, had the authority to use Asmodus's trademarks for his own benefit absent board approval or written authorization.

### b. Implied License Based on the Parties' Course of Conduct

Defendants argue that they "were authorized to manufacture and co-brand with Asmodus during their joint venture period." (Opp'n at 10.)  Specifically, Defendants maintain that Shenxi and Wehe were authorized to manufacture and that ACM was authorized to *sell*  Helve and Minikin products based on an implied license emanating from the Parties' discussions and course of conduct.  (Id. at 11; Supp. Opp'n at 5; Tr. At 23:12-13.)  On the evidence presented, the Court finds the existence of an implied license based on the Parties' course of conduct highly doubtful.

When asked whether there was any documentation reflecting Ou's and his affiliate companies' authority to use and sell the Asmodus marks, Ou impliedly conceded that there was never any formal agreement conferring such rights.  (Tr. At 22:16-25, 23:1-13.)  That said, the Parties agree that the terms of their business collaboration were "loose" from the onset, and "corporate formalities of Asmodus Inc. were not followed."  (Supp. at 3; Ou S. Decl. ¶ 8.)  In fact, according to Ou, "it was common practice for Mr. Yin and [him] to conduct business on behalf of Asmodus, Inc. without express authorization from any board of directors. (Ou S. Decl.

¶ 8.)  Indeed, it appears that Yin and Ou routinely conducted their business based on oral understandings.  (Ou S. Decl. ¶ 9); (Supp. at 3.)

By analogizing Asmodus's customary manner of doing business to a partnership, Ou seems to suggest that his alter ego companies' implied license to sell Asmodus products inhered in the existence of a joint venture between Yin and Ou.  (See, e.g., Tr. at 19:13-16)(A:. . .What consent did you receive? Q: Because for Asmodus I have half of the shares. And also in terms of the method of collaboration, we could sell these products together.)  While the terms under which Ou claims to have retained ownership and control of Asmodus may inform the understandings giving rise to an implied license, it is important to separate the terms of the purported implied license from the terms under which Ou claims to have retained ownership and control of Asmodus.  Ou claims to have acquired shares in Asmodus in exchange for "providing goods to support [Plaintiffs'] sales," and also "help[ing] with their advertisement." (Tr. at 23:19-21.)  Ou testified that he did not believe he could use the Marks because he owned half of the company.  (Id. at 23:7-9.)  The terms under which Ou purportedly retained ownership of Asmodus, therefore, did not include selling Asmodus products through his alter ego companies to American retailers and consumers.

Even if there is no express written license agreement, the Ninth Circuit has held that a trademark license may be implied from the conduct of the parties.  Dep't of Parks & Recreation for State of California, 448 F.3d at 1129–30.  "Licenses are contracts 'governed by ordinary principles of state contract law.'"  Dep't of Parks & Recreation for State of California v. Bazzar del Mundo Inc., 448 F.3d 1118, 1130 (9th Cir. 2006).  The elements for an oral license is the same as a written license.  See Careau & Co. v. Security Pacific Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990) (stating that breach of written and oral contract require the same elements).  "The consent of the parties to a contract must be: 1. Free; 2. Mutual; and, 3. Communicated by each to the other."  Cal. Civ. Code § 1565.  "An essential element of any contract is 'consent.'"  Weddington Prods., Inc. v. Flick, 60 Cal. App. 4th 793, 811 (1998) (citing Cal. Civ. Code § 1550).  "Consent is not mutual, unless the parties all agree upon the same thing in the same sense."  Cal. Civ. Code § 1580.  Furthermore, in order for a contract to be enforceable, the terms of the contract must be sufficiently certain.  Weddington Prods., Inc., 60 Cal. App. 4th at 811.  In the trademark context, a license can also be implied if the licensor exercised a sufficient degree of control over the licensee's operations.  Dep't of Parks & Recreation for State of California, 448 F.3d at 1131.  In order to determine whether there is an implied license, courts look to the parties' course of conduct.  Id. at 1129.

Here, it is undisputed that during the joint venture period, Asmodus exercised actual control over the Asmodus marks by performing warranty services.  However, after the business relationship deteriorated in March of 2016, Plaintiffs began to realize that the Minikin products being sold to consumers not only were of "really bad quality," but also came in colors Asmodus had never made.  (Tr. at 38:18-21.)  As such, since Asmodus had no opportunity to inspect and supervise the products that made their way into customers' hands after March of 2016, it could not have exercised sufficient quality control over its trademarks for the Court to find the existence of an implied license.  Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013

(C.D. Cal. 2011), <u>aff'd</u>, 738 F.3d 1085 (9th Cir. 2013)(observing that in order to grant a trademark license, the licensor must maintain sufficient control over the licensee because that control is necessary to meet the public expectations of quality and source of the goods).

Besides, nothing in the record evinces a course of conduct that may arise to the finding of an implied license. According to Yin, he never orally or in writing, expressly or implicitly, granted to Defendants the right to sell any products under the trademarks Minikin, Helve, and Asmodus. (Yin R. Decl. ¶ 2.) The only license Yin conferred to Defendants was the right to use the Asmodus marks to manufacture and deliver the products for Asmodus's "exclusive sale of these products." (<u>Id.</u>) While Ou claims that the Parties' course of conduct supports the finding of an implied license for ACMs' sales (Ou Decl. ¶ 49), Defendants fail to put forth any affirmative evidence to support this claim. As such, there is nothing in the record to infer that the Parties both "agreed upon the same thing in the same sense," or that the terms of this understanding were sufficiently certain to be enforceable. Cal. Civ. Code § 1580.

Furthermore, Ou concedes that he never made a capital contribution to Asmodus and never signed any document memorializing his ownership in Asmodus. (Tr. at 26:5-11, 24:11-13.) As a result, the sole benefit that could serve as consideration for any purported assignment of rights was his provision of goods to Asmodus. (Tr. at 23:19-23.) Defendants ceased providing Asmodus with any product in early 2016. (Yin R. Decl. ¶ 33.) On that basis, any assignment of Asmodus's exclusive rights to sell products bearing Asmodus marks occurring after December 2015 would not be supported by any legal consideration. Accordingly, Defendants' belief that they sold the Asmodus products under an implied license is contradicted by the record.

### c. First Sale Doctrine and Exception to Liability for Importation of Genuine Grey Market Goods

In their Opposition, Defendants contend that under the First Sale Doctrine there is no trademark infringement liability for the sale of genuine goods bearing a true mark even though such a sale was without the mark owner's consent. (Opp'n at 11.) In their supplemental opposition, Defendants further argue that there is no trademark infringement liability for the products they sold because they "were genuine grey market goods." (Supp. Opp'n at 6.) At the same time, they assert that the "only products sold by Defendants were authorized Asmodus Products." (<u>Id.</u> at 12.) If the products were "authorized," then only the first sale doctrine could apply. As such, the Court will presume that these defenses are argued in the alternative.

For the reasons stated above, the First Sale Doctrine is inapplicable to these facts. Under "first sale" rule, trademark law generally does not reach sale of genuine goods bearing true mark even though such sale is without mark owner's consent; once trademark owner sells his product, buyer ordinarily may resell product under original mark without incurring any trademark law liability. <u>Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.</u>, 112 F.3d 1296 (5th Cir. 1997). <u>Cf</u>. <u>SoftMan Prod. Co., LLC v. Adobe Sys., Inc.</u>, 171 F. Supp. 2d 1075, 1082 (C.D. Cal. 2001)(describing the first sale doctrine in the copyright context as "limit[ing] the exclusive right to distribute copies to their first voluntary disposition. . .")). Ou testified that the

Asmodus products sold by ACM were purchased from Wehe.  (Tr. at 20:15-17.)  As discussed, Wehe was never authorized to sell Asmodus products; only to manufacture them for Asmodus's exclusive distribution.  Furthermore, it appears that the Minikin products sold by ACM were the vaporizers that were manufactured for Asmodus, but never delivered.  Accordingly, the products at issue here were never sold by Asmodus so the First Sale Doctrine provides no defense to Plaintiffs' claims.

Defendants' characterization of the products they sold as "grey market goods" is similarly unavailing for purposes of escaping trademark liability.  In general terms, a gray market good, often referred to as a parallel import, is "[a] foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 285 (1988).  To escape liability for grey market goods, Defendants must show their products did not materially differ from the authorized Asmodus products.  PepsiCo, Inc. v. Reyes, 70 F. Supp. 2d 1057, 1059 (C.D. Cal. 1999).  The threshold of materiality "is always quite low." Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 641 (1st Cir. 1992). "[T]he existence of any difference between registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade Mark Act claim." Id.; see Grupo Gamesa S.A. v. Dulceria El Molino Inc., 39 U.S.P.Q.2d 1531, 1533 (C.D. Cal. 1996).

In this case, there are material differences between the allegedly counterfeit Minikin products and the genuine Minikin products.  "Material differences can relate to a product's quality control standards, packaging, and price." Hokto Kinoko Co., 810 F. Supp. 2d at 1025. (C.D. Cal. 2011).  A photo of an alleged counterfeit Minikin 2.0 vaporizer turned in by a customer on March 25, 2017 has venting holes positioned in a different pattern as the authentic Asmodus Minikins.  (Yin Decl. ¶ 21.)  Further, Plaintiffs submitted photos of Minikin vaporizers in blue and chrome, which according to Yin, are colors Asmodus had yet to make.  (Yin Decl. ¶ 25; Tr. at 39:17-22.)  Some of the Minikin vaporizers sold by Defendants contain the Asmodus Wheel Logo with the word "WeheMod" inscribed in the center instead of "Asmodus."  (Yin Decl. ¶ 27.)  The packaging of the allegedly counterfeit Minikins also materially differs.  Some of the Minikin packages display "Wehe," while the genuine Minikins are enclosed in packages displaying "Asmodus." (Yin R. Decl. ¶ 13.)  Furthermore, there is evidence that the Minikin products sold by Defendants are of lower quality than genuine Asmodus products.  According to Tony Tran, an Asmodus Sales Associate, many customers have returned Asmodus products due to their poor quality. (Tran Decl. ¶ 3.)  These products were later determined to be counterfeits.  (Tr. at 38:18-19.)  These differences in the products' quality, appearance, and packaging are material and demonstrate a likelihood of confusion concerning the nature and origin of the goods. PepsiCo, Inc., 70 F. Supp. 2d at 1060.  As such, Defendants' products are not grey market goods and are subject to Lanham Act liability.

//

**B. Irreparable Harm**

Following issuance of the Supreme Court's decision in <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006), a court may no longer presume irreparable injury from the bare fact of liability in a copyright or trademark case.  Nonetheless, the injury caused by the presence of infringing products in the market—such as lost profits and customers, as well as damage to goodwill and business reputation—will often constitute irreparable injury.  <u>See</u>  <u>Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.</u>, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm"); <u>Kalologie Franchising LLC v. Kalologie Skincare Med'l Group of California</u>, Case No. CV 14–00016 DDP, 2014 WL 953442, at *5 (C.D. Cal. Mar.11, 2014) ("A plaintiff's loss of control over its business reputation resulting from a defendant's alleged unauthorized use of its protected mark during the pendency of an infringement action can constitute irreparable harm justifying injunctive relief").  Such harms are difficult to quantify and compensate over time.  <u>See</u> <u>Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.</u>, 736 F.3d 1239, 1250 (9th Cir. 2013).  Contrary to Defendants' assertion, Plaintiffs have adequately demonstrated that they have been, and continue to be, irreparably harmed by Defendants' continued sale of counterfeit Asmodus products to American consumers.

Plaintiffs have presented evidence of their loss of control over their marks, and the loss of their business reputation.  That the Blue Minikin products have turned up in the marketplace, when these blue Minikin's were never sold by Asmodus, strongly suggests that Yin and Asmodus have lost control over their marks and the marketing of their products.  (FAC ¶ 64.)  Furthermore, since the entry of these counterfeit products, Asmodus's sales have dropped precipitously.  (Yin Decl. ¶¶ 20-22, 35.)  Defendants capitalize on Asmodus's good will and business reputation by targeting Asmodus's retail customers to aggressively market "new" Asmodus products to them. And as mentioned above, there is evidence of actual consumer confusion that is widespread in the vaping industry blogosphere.  The fact that Asmodus has received calls and performed repairs on counterfeit Helve and Minikin products shows that purchasers that buy Defendants' counterfeits undoubtedly believe they are purchasing genuine Asmodus products.   In short, Defendants' actions have tarnished the Asmodus brand and threaten to destroy its business completely.

Moreover, on the evidence presented, there is no reason to conclude that Defendants will cease their infringing conduct. <u>See, e.g.</u>, <u>Microsoft Corp. v. Atek 3000 Computer Inc.</u>, No. 06 CV 6403(SLT)(SMG), 2008 WL 2884761, *5 (E.D.N.Y. July 23, 2008) (concluding that plaintiff had shown irreparable injury where it had "established that defendant committed copyright and trademark infringement, and ... there [was] no reason to conclude that defendant ha[d] or [would] cease its infringing acts because it continued infringing plaintiff's copyrights and trademarks despite being notified of its infringement").  In fact, Plaintiffs proffered evidence of a counterfeit Minikin 2.0 product that was turned in by a customer on March 25, 2017.  (Yin Decl. II ¶ 20.)  In conclusion, absent preliminary relief, Asmodus and Yin will continue to be irreparably harmed by Defendants' conduct during the pendency of this litigation.

## C. Balance of Equities and Public Interest

Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. Of Gambell, Alaska, 480 U.S. 531, 542 (1987); Cybermedia, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1073 (N.D. Cal. 1998) (copyright infringement); see also Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 826 (9th Cir. 1997) (citing Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1517 (9th Cir. 1992)).

Defendants cannot claim that enjoining any further sales of Asmodus products—whether genuine or counterfeit—would cause them irreparable harm. For one thing, Defendants rely on the first sale doctrine defense to justify their unauthorized sales of remaining inventory. As such, Defendants appear to have already recouped any losses stemming from Plaintiffs' purported breach of contract or fraud. Enjoining any further sales causes no injury to Defendants. See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co., 290 F.3d 578, 596 (3rd. Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."). Furthermore, the Court rejects the contention that this preliminary injunction alters the status quo ante litem. The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead "the last uncontested status which preceded the pending controversy." Tanner Motor Livery, Ltd. V. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963). The status quo ante litem existed before Defendants began using Asmodus's protected marks and copyrighted expression without Asmodus's authorization.

In short, Defendants' claims of irreparable injury are unavailing. Moreover, Defendants fail to rebut Plaintiffs' evidence of imminent irreparable harm. Plaintiffs have, therefore, adequately demonstrated that the balance of hardships tips in favor of granting the injunction. The Court does not find the injunction Plaintiffs seek as going further than that which is necessary to cure the damage already done by Defendants' infringing conduct. The Court, therefore, does not find the scope of the injunction requested to be unreasonable because "[w]hen the infringing use is for a similar service, a broad injunction is 'especially appropriate.'" GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1211 (9th Cir. 2000) (citing Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1181 (9th Cir. 1988)).

The Court also finds that an injunction would be in the public interest. "Enjoining violation of federal statutes is in the public interest." Am. Trucking Assocs., Inc. v. City of Los Angeles, 559 F.3d 1046, 1060 (9th Cir. 2009). "[T]he most basic public interest is the public's right not to be deceived or confused." Warner Bros. Ent't, 2012 WL 6951315 at * 23; see Internet Specialties W., Inc. v. Milon–DiGiorgia Enter., Inc., 559 F.3d 985, 991 (9th Cir. 2009). Here, Defendants are using marks identical to Asmodus's. They are misleading Asmodus's consumers by holding themselves out to be authorized sellers of Asmodus's private lines, Snow Wolf, Minikin, and Helve. Defendants' advertising confuses consumers about the source and quality of the goods associated with Asmodus. See Paisa, Inc. v. N & G Auto, Inc., 928 F. Supp. 1009, 1013 (C.D. Cal. 1996) (stating that there is a "strong public interest in preventing consumer

confusion and fraud favors issuance of the requested injunctive relief." ) (citing Church of Sceintology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 44 (2d Cir. 1986)). The public interest, therefore, favors an injunction.

## D. Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has recognized that Rule 65 "invests the court with discretion as to the amount of security required, if any." Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original) (quoting Barahona–Gomez v. Reno, 167 F.3d 1228, 1237 (9th Cir. 1999)). Thus, the purpose of the bond is to safeguard a defendant if the Court later determines that a defendant has been wrongfully enjoined.

The Court does not find a bond to be appropriate under these circumstances. For one thing, any lost profits would be entirely speculative because Defendants do not list any tangible costs they would incur as a result of a preliminary injunction. In claiming they face $500,000 in potential damages, Defendants do not identify how this figure was calculated. Furthermore, there is no indication that Defendants will be unable to carry on their businesses by selling non-infringing products with different insignia or logos. Plaintiffs, on the other hand, have adduced evidence of substantial destruction of their customer base and business reputation. Additionally, Defendants have dragged on this litigation for months, evaded service, and advanced evolving defenses based on assorted and inconsistent accounts of what actually happened. Plaintiff has incurred significant legal expenses as a result. Where Plaintiffs have made a robust showing that they are likely to succeed on the merits of their claims and Defendants advance no legitimate or persuasive defenses, Defendants cannot persuade the Court they are entitled to the security of a bond to insure them against losses that appear to be entirely of their own manufacturing. Accord Burger King Corp. v. Majeed, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) ("One who adopts the mark of another for similar goods acts at his own peril," since he has no claim to the profits or advantages thereby derived.").

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.

**IT IS SO ORDERED.**